# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ILLINOIS UNION INSURANCE COMPANY,<br><br>                              Plaintiff,<br>    vs.<br><br>NORTH COUNTY OB-GYN MEDICAL GROUP, INC., et al.,<br><br>                            Defendants. | CASE NO. 09cv2123-LAB (JMA)<br><br>**ORDER AFFIRMING ARBITRATION RULING** |

This case involves an insurance coverage dispute between Illinois Union Insurance Company ("IU") and North County Ob-Gyn ("NCOG"). The dispute raises the question whether legal fees paid by IU on NCOG's behalf erode the liability limit of a policy that IU issued to NCOG. An arbitration panel has already ruled in NCOG's favor. Now before the Court is IU's motion to vacate the arbitration panel's ruling. For the reasons given below, the motion is **DENIED**.

**I.     Background**

NCOG purchased a "Business Management and Indemnity Policy" from IU. That policy contains an "Employment Practices Coverage Section," under which NCOG is insured against claims that arise in the context of the workplace: hostile work environment,

//

employment-related discrimination, retaliation, and the like. The policy entitles NCOG to $1 million in coverage for these claims.

On September 27, 2005, NCOG was sued by its former chief financial officer, Seth Bulow, for wrongful termination, breach of contract, breach of covenant of good faith and fair dealing, intentional infliction of emotional distress, and negligent infliction of emotional distress. On October 6, 2005, Bulow and another individual, NCOG patient Kathrin Hoeyng, filed a *qui tam* action against NCOG alleging fraudulent billing practices. Finally, Bulow filed a second case against Illinois Union on February 2, 2006 alleging unpaid wages, violations of the California Labor Code, and a breach of fiduciary duty, and demanding, among other things, a dissolution of NCOG. These cases triggered coverage under NCOG's policy with IU, and IU agreed to defend NCOG in each of them, subject to a reservation of rights. IU then hired the law firm of Manning & Marder to defend NCOG.

IU paid Manning and Marder's bills and periodically notified NCOG of its remaining balance under the policy. For example, on July 24, 2007, IU informed NCOG that $500,000 had been spent in its defense and that "approximately $500,000 of the Policy limit remains." On October 10, 2007, IU informed NCOG that $717,775 had been spent and that "$282,225 of the Policy limit remains." In both correspondences IU noted, "Once the Policy limit is exhausted, coverage obligations, if any, to or on behalf of the Insureds will terminate and IU will not have a duty to defend any of the Insureds in the Lawsuits." NCOG responded to each of IU's updates, but only, as the arbitration panel put it, "in fairly nonspecific terms." NCOG agreed that IU had a continuing duty to defend it, but subtly hinted that it didn't agree that Manning and Marder's fees were eating away at its coverage under the policy.

On March 20, 2008[1] IU informed NCOG that it had exhausted its liability limit of $1 million under the policy. As such, IU explained, "coverage obligations, if any, to or on behalf of the Insureds have terminated and IU does not have a continuing duty to defend any of the Insureds in the Lawsuits." NCOG responded with a substantive analysis of the policy's

---

[1] The correspondence referenced here is actually dated March 20, 2007, but the Court presumes that was an error. *See* Ex. 1-P

terms, arguing that "NCOG's $1 million limit of liability is still intact and has not been reduced by the fees and costs that IU has paid to its panel defense counsel at Manning & Marder." NCOG then made its own arrangements to defend the underlying lawsuits, saw them to a final disposition, and initiated the arbitration that IU now appeals.

IU's position is that the costs of defending NCOG eat away at its coverage under the policy. NCOG's position is that they don't, and that IU has a duty to defend NCOG that is separate from its duty to insure NCOG against claims. The parties' arguments can both be understood as starting with the same policy provision:

> Payments of Loss by Insurer shall reduce the Limit(s) of Liability under this Coverage Section. Costs, Charges and Expenses are part of, and not in addition to, the Limit(s) of Liability and payment of Costs, Charges and Expenses reduces the Limit(s) of Liability. If such Limit(s) of Liability are exhausted by payment of Loss, the obligations of the Insurer under this Coverage Section are completely fulfilled and extinguished.

(Policy, 15.) The question is whether defense costs — the fees IU paid to Manning & Marder on NCOG's behalf — are a "Loss" under the policy.[2] IU says they are, and NCOG says they're not.

IU's position, merits aside, is certainly the more straightforward of the two. "Loss" includes "Costs, Charges and Expenses." The provision quoted above implies as much, and the policy elsewhere states, "Loss means the damages, judgments, settlements, including front pay and back pay, pre-judgment or post-judgment interest awarded by a court, and Costs, Charges and Expenses incurred by any of the Insureds." (Policy, 28.) But what counts as "Costs, Charges and Expenses"? The policy defines "Costs, Charges and Expenses," in relevant part, as "reasonable and necessary legal costs, charges, fees and expenses incurred by any of the Insureds in defending Claims." (Policy, 9.) Therefore, IU

//

---

[2] Other key provisions raise the exact same question with respect to "Loss." For example, the first provision in the policy reads, "The limits of liability available to pay insured loss shall be reduced by amounts incurred for costs, charges and expenses. Amounts incurred for costs, charges and expenses and loss shall also be applied against the retention and deductible amounts." (Policy, 1.) The Employment Practices Coverage Section of the policy provides "Insurer shall pay the Loss of the Insureds which the Insureds have become legally obligated to pay by reason of an Employment Practices Claim . . . . " (Policy, 9.)

argues, its payments to Manning & Marder come out of NCOG's total coverage under the policy.

NCOG reasons from the same definitions of "Loss" and "Costs, Charges and Expenses" but seizes on the words "incurred by any of the Insureds" that appear in both. It denies that the fees paid by IU to Manning & Marder were "incurred" by NCOG, even though the payments were obviously made on NCOG's behalf, because IU had a separate contractual duty, under the policy, to defend NCOG. The policy states, "It shall be the duty of the Insurer and not the duty of the Insureds to defend any Claim" — and specifies no monetary limit. Moreover, NCOG argues, it didn't "incur" any legal fees; Manning & Marder sent its bills straight to Illinois Union, and Illinois Union paid them.

The arbitration panel ruled in favor of NCOG. It found that, at a minimum, the policy is ambiguous — and ambiguities in insurance policies are to be resolved against the drafter and in favor of broader coverage. The panel also found that NCOG's interpretation of the policy is reasonable. It was persuaded by several factors. First, the policy clearly provides that IU has a duty to defend NCOG, and the policy makes no mention "of any limit or offsets to the insurer's obligation to provide a defense." Second, the panel concluded that the inclusion of the words "incurred by any of the Insureds" in the definition of "Costs, Charges and Expenses" "was intentional and the only apparent reason was to limit the scope of Costs, Charges and Expenses." Third, the definition of "Loss" in the policy explicitly excludes from its scope "any amount for which the Insured is not financially liable or legally obligated to pay." This would appear to cover the costs of litigation, which IU, not NCOG, was legally obligated to pay under the policy. Finally, the panel "found it relevant, although not dispositive, that other policies issued by Respondent contained language that was . . . in our opinion, far more precise in terms of expressing an intention that monies spent on defense costs would reduce the monies otherwise available for coverage."

**II.   Legal Standard**

This Court's review of an arbitration award "is both limited and highly deferential." *Poweragent Inc. v. Elec. Data Sys. Corp.*, 358 F.3d 1187, 1193 (9th Cir. 2004). The

question for the Court certainly isn't whether it would have reached the same decision as the arbitration panel. *Local Joint Executive Bd. of Las Vegas v. Riverboat Casino, Inc.*, 817 F.2d 524, 527 (9th Cir. 1987). "Broad judicial review of arbitration decisions could well jeopardize the very benefits of arbitration, rendering informal arbitration merely a prelude to a more cumbersome and time-consuming judicial review process." *Kyocera Corp. v. Prudential-Bache T Serv's, Inc.*, 341 F.3d 987, 997–98 (9th Cir. 2003).

The Federal Arbitration Act provides that an arbitration award may be vacated "[w]here the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(5). "'[A]rbitrators exceed their powers . . . not when they merely interpret or apply the governing law incorrectly, but when the award is completely irrational, or exhibits a manifest disregard of law.'" *Schoenduve Corp. v Lucent Technologies, Inc.*, 442 F.3d 727, 731 (9th Cir. 2006) (quoting *Kyocera Corp.*, 341 F.3d at 997). "Neither erroneous legal conclusions nor unsubstantiated factual findings justify federal court review of an arbitral award . . . ." *Kyocera Corp.*, 341 F.3d at 994. To the contrary, "confirmation is required even in the face of erroneous findings of fact and misinterpretations of law." *Id.* (quoting *French v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 784 F.2d 902, 906 (9th Cir. 1986)).

**III.    Discussion**

IU believes the policy is, unquestionably, a "self-reducing" or "eroding" or "burning limits" policy "under which defense costs must reduce Policy Limits." Three provisions, it argues, make this clear.

> The limits of liability available to pay insured loss shall be reduced by amounts incurred for costs, charges and expenses. Amounts incurred for costs, charges and expenses and loss shall also be applied against the retention and deductible amounts. (Policy, 1.)
>
> Payments of Loss by Insurer shall reduce the Limit(s) of Liability under this Coverage Section. Costs, Charges and Expenses are part of, and not in addition to, the Limit(s) of Liability and payment of Costs, Charges and Expenses reduces the Limit(s) of Liability. If such Limit(s) of Liability are exhausted by payment of Loss, the obligations of the Insurer under this Coverage Section are completely fulfilled and extinguished. (Policy, 15.)

> Limit of Liability: $1,000,000 aggregate for all Loss . . . $0 additional aggregate for all Costs, Charges and Expenses (Policy, 1.)

The arbitration panel rejected this argument, of course, which had the consequence, as IU puts it, of "effectively limiting the $1 million of available coverage to indemnity payments only and making the Policy truly limitless for defense costs and fees." Was this decision completely irrational, or did it exhibit a manifest disregard for the law? *Schoenduve Corp.*, 442 F.3d at 731. IU thinks so, because it entitles NCOG to an award that exceeds "plainly written policy limits." But that just begs the question whether the policy's limits are plain and uncontestable, or whether, as the arbitration panel concluded, there's an ambiguity in the policy that is susceptible of conflicting interpretations.

The Court sides with the arbitration panel. The policy provisions relied upon by IU don't speak for themselves. To the contrary, the natural thing to ask when reading them is what the definition of "Loss" is, and what the definitions of "Costs, Charges and Expenses" are. That inevitably brings the analysis to the words, "incurred by the Insureds."

> Loss means the damages, judgments, settlements . . . awarded by a court, and Costs, Charges and Expenses incurred by any of the Insureds. (Policy, 28.)
>
> Costs, Charges and Expenses means reasonable and necessary legal costs, charges, fees and expenses incurred by any of the Insureds in defending Claims. (Policy, 9.)

Focusing on those words, and concluding that NCOG didn't "incur" any costs in the form of legal fees, isn't to engage in "creative contract interpretation," or a "crimped exegesis of a four-word Policy fragment," or the interpretation of a provision in isolation, as IU maintains, nor is it to ignore the policy as a whole. To the contrary, it's to *engage* the policy as a whole in order to discern the meaning of critical terms.

NCOG asks the Court to heed the decision in *Helfand v. Nat'l Union Fire Ins. Co.*, 10 Cal.App.4th 869 (1993), which held the terms of a particular insurance policy "make it clear that defense costs are payable against the limits of liability just like any other element of 'loss' as defined in the policy." Two problems: First, the policy at issue in *Helfand* didn't have the exact same terms as the policy at issue here. In fact, it defined the "loss" covered

by the policy as including "costs, charges and expenses . . . *incurred in the defense of actions*, suits or proceedings and appeals therefrom." *Id.* at 880 n.3 (emphasis added). Second, the policy in *Helfand* was a "Directors and Officers" policy under which the insurance carrier isn't obligated to provide the insured with a defense. *Id.* at 879. That's precisely why defense costs draw down the liability limit of the policy:

> The defense obligations of D&O carriers typically differ in nature and scope from the defense obligations of general liability carriers. For example, D&O policies generally do not obligate the carrier to provide the insured with a defense. More likely, they require the carrier to reimburse the insured for defense costs as an ingredient of 'loss,' a defined term under the policy.

*Id.* NCOG's policy with IU contains a Directors and Officers section, but that portion of the policy isn't implicated in this matter.

IU attempts to implicate it, however, by locating the origins of the "incurred by" language there, where it is necessary because directors and officers obtain counsel for themselves and are later reimbursed by IU, such reimbursement drawing down their policy limit. That much makes sense. What makes less sense, though, is IU's argument that this explains why the "incurred by" language appears in the Employment Practices Section of the policy — or why the only objective reading of the EPL policy is that legal fees draw down the liability limit. Both arguments fail, in the Court's view, because there's no reason to assume that the D&O coverage and the EPL coverage are intended to work in the same way, or must be read to harmonize. In fact, there's a big difference between them. The EPL section provides that "[i]t shall be the duty of the Insurer and not the duty of the Insureds to defend any Claim," and the D&O provision provides the exact opposite: "It shall be the duty of the Insureds and not the duty of the Insurer to defend any Claim."[3] (Policy, 16, 25.) IU argues that this difference is no big deal; it goes only to the question of who hires a lawyer for NCOG — NCOG or IU? But that is not the only sensible reading of the policy. The arbitration panel reached the conclusion that the manner in which the duty to defend is

---

[3] In its memorandum IU notes that "the D&O insured is initially first responsible for retaining and paying a lawyer to defense itself; the Insurer is later required to make quarterly advances on behalf of the Insured . . . in order to live up to its duty of defense." That IU has a duty to defend NCOG against D&O claims contradicts the policy's plain terms.

articulated in the EPL section of the policy implies that the defense of NCOG is extraneous to IU's duty to pay for any "loss" it suffers. That was not a completely irrational conclusion, nor was it facilitated by a manifest disregard of the law. To be sure, the Court understands what IU's position is; it just doesn't agree that the only objective reading of the policy is the one that IU urges.

Finally, IU argues that *U-haul Int'l, Inc. v. Lumbermens Mut. Casualty*, 348 Fed.Appx. 208 (9th Cir. 2009), holds that "the phrase 'incurred by the insured' means the amounts that the insured might have been legally obligated to pay even though the Insurer pays them directly." It's hard to rely on *U-Haul* for much of anything, however. It is a very short memorandum disposition, and the substance on which IU relies comprises a mere paragraph. Moreover, the relevant text of the policy at issue doesn't make its way into the opinion, making it hard to compare that case to this one. But most importantly, even if it's true that "incurred by" means "legally obligated to pay," NCOG could still argue that it wasn't "legally obligated to pay" its defense costs under the policy, and that IU *was*. IU really needs "incurred by the insureds" to mean "for the benefit of the insureds," but *U-Haul* doesn't go nearly that far.[4]

To the extent the Court sees this case any differently than the arbitration panel has, perhaps it's less inclined to view the inclusion of the words "incurred by the insureds" in the EPL portion of the policy as intentional and designed to "limit the scope of Costs, Charges and Expenses." Frankly, the Court's impression is that the policy simply wasn't drafted carefully, and that we're confronted with a classic case of an ambiguity that can reasonably be resolved in either party's favor. (That isn't entirely out of line with the arbitration panel's decision, actually. "At a minimum," it concluded, "the insertion of the words 'incurred by the insureds' into the definition of [Costs, Charges and Expenses] makes the definition ambiguous.") In its initial review of this case, the Court was very concerned with NCOG's failure to communicate, at the earliest opportunity, its disagreement with IU's position that

---

[4] IU also cites *Lolley v. Campbell*, 28 Cal.4th 367, 373 (2002) in its supporting memo. The arbitration panel distinguished *Lolley* from this case, and the Court agrees with its analysis.

Manning & Marder's fees were reducing the policy's liability limit. The arbitration panel addressed that concern to the Court's satisfaction:

> It is true that the responsive communications might have been more descriptive. We note and take judicial notice, however, of the common practice in correspondence between coverage counsel and an insured's counsel to reserve rights to assert all sorts of positions — often fairly ridiculous ones — and for all parties to accept such reservations as effective means of avoiding waivers of positions.

IU was clear that, in its view, the Manning & Marder bills it was paying on NCOG's behalf were eroding the $1 million liability limit of the policy. Rather than stay silent and reserve rights, counsel for NCOG could have objected, and both parties would have at least been on the same page. On the other hand, IU could have followed up with NCOG when, on the face of letters from NCOG's counsel, it was clear that NCOG agreed only that IU had an ongoing duty to defend it. If this is a classic case of an arbitrary contract provision admitting of competing interpretations, it is also a classic case of what can happen when parties to an agreement refuse to communicate like real people.

## IV.  Conclusion

That the Court has gone so far as to *defend* the ruling of the arbitration panel is, obviously, more than is required to affirm that ruling. It is entitled to substantial deference, and the Court sees nothing, in either the record or in IU's memorandum, to suggest that such deference is not warranted here. "As long as [an arbitration ruling] draws its essence from the contract, meaning that on its face it is a plausible interpretation of the contract, then the courts must enforce it." *Sheet Metal Workers' Int'l Ass'n v. Madison Indus., Inc.*, 84 F.3d 1186, 1190 (9th Cir. 1996). The arbitration panel's interpretation of the policy at issue in this case was, at a minimum, plausible. IU's motion to vacate the ruling is therefore **DENIED**.

**IT IS SO ORDERED**.

DATED: May 18, 2010

*Larry A. Burns*

**HONORABLE LARRY ALAN BURNS**
United States District Judge